# JM

### JOSEPH MURE JR & ASSOCIATES
26 Court Street • Suite 2601 • Brooklyn, NY 11242 • 718.852.9100
joemurejr@aol.com

August 2, 2019

Honorable Judge Alison J. Nathan
United States District Court Judge
Southern District of New York
500 Pearl Street
New York, NY 10007
VIA ECF

> **RE:   SENTENCING MEMORANDUM**
> **United States v. Gerard Scparta**
> **Docket No. 18-CR-578-01 (AJN)**

Dear Judge Nathan,

As you are aware, our offices represent the above referenced individual scheduled for sentencing by the Court on August 9, 2019.

On April 15, 2019, Gerard Scparta pled guilty before Your Honor to Counts 1 and 4 of a four count Superseding Information. Count 1 charged that Mr. Scparta fraudulently obtained approximately $638,586 in Social Security disability benefits to which he was not entitled in violation of 18 U.S.C. 641. Count 4 charged that Mr. Scparta attempted to evade and defeat the payment of a substantial part of the income taxes due and owed for the tax years 2012 through 2016 in violation of 26 U.S.C. 7201.

With calculated Total Offense Level of 19 and a Criminal History Category of I, the Department of Probation's Presentence Report ("PSR") contains a recommended sentence of twenty four (24) months.

However, the Sentencing Commission has itself "*stressed the difficulty of prescribing a single set of guidelines that encompasses the vast*

1

*range of human conduct potentially relevant to a sentencing decision"*.
U.S.S.G. Guidelines Manual, Ch. 1, Pt. A, intro. cmt. 4(b)].

Indeed, as so astutely stated by the Court in United States v. Myers,
353 F. Supp. 2d 1026 (S.D. Iowa 2005):

> *"If the 600-plus pages of the most recent set of sentencing guidelines have taught us anything, it is that punishment cannot be reduced to an algorithm"*.

It is thus *"uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate…the crime and the punishment to ensue"*. United States v. Koon,
116 S. Ct. 2035 at 2053 (1996).

## APPLICATION FOR A REASONABLE NON-GUIDELINE SENTENCE PURSUANT TO 18 U.S.C. §3553(a)

As the Court is undoubtedly aware, pursuant to the Supreme Court's decision in Booker, the United States Sentencing Guidelines were afforded the status which their name originally implied. To clarify and repeat, they are simply *guidelines* and no longer represent legislative mandates.

Several factors enumerated in 18 U.S.C. §3553 (a) must thus be considered and weighed in fashioning an appropriate sentence. See Booker, 543 U.S. at 245-46, 264-55; United States v. Crosby, 397 F. 3rd 103 (2nd Cir. 2005).

In addition to considering the Guidelines and Policy Statements as required by §3553(a)(4) and (a)(5), the Court must also consider the following factors:

(1)  the nature and circumstances of the offense and the history and characteristics of the defendant;

(2)     the need for the sentence imposed including:
    (A)     to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
    (C)     to protect the public from further crimes of the defendant;

(3)     the kinds of sentences available;
…

These §3553 (a) factors focus on the defendant as an individual and stand in stark contrast to the mandates of U.S.S.G. Chapter 5, Part H ("Specific Offender Characteristics") which, absent extraordinary circumstances, forbid the Court's consideration of a defendant's personal characteristics and history.

Indeed, sentencing Courts are now "*required to consider a host of individual variables and characteristics excluded from those calculations called for by the Guidelines*". <u>United States v. West</u>, 353 F. Supp. 517 (S.D.N.Y. 2005). Moreover, "*consideration of the §3553(a) factors is not a cut and dried process of fact finding and calculation, instead a district judge must contemplate the interplay among so many facts in the record and the statutory guideposts*". <u>United States v. Fernandez</u>, 443 F. 3rd 19 (2nd Cir. 2006).

More recently, in <u>Pepper v. United States</u>, 562 U.S. 476 (2011), the Court twice emphasized that a sentencing judge assumes "*an overarching duty under § 3553(a) to 'impose a sentence sufficient, but not greater than necessary' to comply with the sentencing purposes set forth in § 3553(a)(2).*" <u>Id</u>., at 493. See also <u>United States v. Dorvee</u>, 604 F.3d 84, 93 (2d Cir. 2010) *("[u]nder §3553(a)'s 'parsimony clause,' it is the sentencing court's duty to 'impose a sentence sufficient, but not greater than necessary to comply with the specific purposes set forth' at 18 U.S.C. §3553(a)(2)"*), quoting <u>United States v. Samas</u>, 561 F.3d 108, 110 (2d Cir. 2009).

As the Second Circuit explained in <u>Dorvee:</u>

*"[e]ven where a district court has properly calculated the Guidelines, it may not presume that a Guidelines sentence is reasonable for any particular defendant, and accordingly, must conduct its own independent review of the §3553(a) sentencing factors".*

Consistent with the foregoing, we respectfully request the Court consider the following factors in connection with its fashioning of an appropriate sentence in the instant matter.

### (A)    Gerard Scparta and the Scparta Family's Civic Deeds

On July 15th 1986, Gerard Scparta joined the New York City Police Department. After ambitiously graduating from the Police Academy on December 29, 1986, Mr. Scparta was assigned to the 7th Precinct in New York City's Lower East Side. By July 1987, Scparta had been assigned to the 1st Precinct in the southernmost tip of Manhattan - home to SOHO, Tribeca, Wall Street and, as fate would have it, the iconic World Trade Center.

Gerard Scparta's service with New York City Police Department in the decade plus that followed was highlighted with many accolades including, without limitation, the following:







Despite leaving the New York City Police Department on disability four years earlier, Gerard Scparta rushed to his former precinct – the World Trade Center – on September 11, 2001 as soon as he heard what was happening. Prior to the 9/11 terrorist attacks, the World Trade Center was already hallowed ground to Mr. Scparta. He had become engaged to his wife there as well as dealt with the fallout of the first terrorist attack there in 1993.

Even though he had retired, Gerard Scparta volunteered and immediately joined the rescue crew. While doing so, Scparta was also looking for his best friend and brother-in-law, FDNY firefighter Lenny Ragaglia:

"*While working on the pile, I saw things there that I had never seen*

*before. We found a passenger still seat-belted into his chair from one of the airlines. He was burnt. I also encountered a shoe with a foot still in it, amongst many other body parts. I now think about death all the time. The things I saw and the body bags I filled will be with me forever. Like many other rescue workers, this experience was a traumatic shock for me.*"

(<u>Exhibit D</u>: Gerard Scparta)

Gerard Scparta proceeded to participate in rescue, recovery and cleanup operations at the World Trade Center site throughout the month of September 2011 (<u>Exhibit E</u>) – never to find his brother-in-law.

One need look no further than Gerard Scparta's children for evidence that his public service and dedication to community safety run deep. They are traits that he has passed on and instilled in each of his six children - all of which are gainfully employed in civic service. In this regard, his son Gerard Scparta Jr. is a New York City Police Department Officer at Midtown North's Precinct, his son Joseph Scparta is a Fire Department of New York Emergency Medical Technician, his son Edward Scparta works for the New York City Department of Education, his daughters Alyssa Scparta and Brianna Scparta are teachers and daughter Jenna Scparta is a registered nurse at a local hospital.

Based on the foregoing, we respectfully submit that Gerard Scparta's civic deeds may, in combination with other characteristics and/or circumstances, provide grounds for leniency by this Court (see U.S.S.G. §5K2.0; <u>United States v. Rioux</u>, 97 F 3d 648 (2nd Cir. 1996).

### (B)    The Abandonment of Gerard Scparta's Role as Patriarch of an Extended Family Unit

Gerard Scparta is married to his soulmate of thirty years (Maureen Scparta) and the couple have six children. In their respective correspondence to the Court, each of the Scparta's children confide on the nature of their respective relationship with their father:

"*My father was born into a low class, single mother household. Unfortunately, my dad never grew up with a father, his dad left before he was born. This is significant in my life because growing up with my dad, he helped demonstrate how I should act and be as a father. Since my dad didn't have a father it was very moving that he could adapt to this role as a dad with zero experience. Nonetheless, he fathered six children. Since my dad is so dedicated to his family, he created this foundation of a fatherly role with no actual father figure. And because of his dedication, there's no other person I would rather emulate than my dad.*"

(<u>Exhibit F</u>: Nicholas Scparta)

\*　\*　\*　\*　\*　\*　\*　\*　\*　\*　\*　\*

"*I hope this letter can help portray my father as the good, kind, loving man that I know and love.*

*My dad has shaped me into a successful, hardworking young woman. Throughout all my years of schooling, my dad was by my side helping me learn study skills, writing out notecards, and helping me find ways to make learning easier. He was my hardest critic but my biggest cheerleader. In the back of my head I always could hear him saying, "You need to work hard, stay focused and never give up"...*

*My dad taught me that family is fundamental, and love is our foundation. My family thrives on traditions, but there is a special one my father started that we hold dear to our hearts and still celebrate. Sunday is family day. Every Sunday started off with a homemade breakfast that my whole family would enjoy at the table together. While the girls would help clean the dishes, the boys would go outside with dad to set up some sport we could all play —dysfunctional family kickball was our go-to. The girls would be on my dad's team and the boys would be on my mom's team. My siblings and I are all very competitive so the game would end because one of us got into a fight*

*or others didn't like losing. To this day, I don't believe we ever finished a game, but my dad would make us all come together. There, he would tell us, "You guys don't know how lucky you are to have each other, you need to be there for one another and always have each other's back". After a nice afternoon of family time, we would end the day with a delicious Italian dinner. For so many years my siblings and I took family days for granted, not really wanting to be there because our friends were doing something else. In the last few years, with all of us "kids" getting older, we cherish each and every family day, patiently waiting for the next time we will all be together. If it wasn't for my dad instilling in us that Sundays are for family, I don't believe we would all have the bond we have today."*

(Exhibit G: Alyssa Scparta)

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

*"Whenever I meet anyone who knows my family, I often hear, "You are your father's son". I take that as a tremendous compliment, because my father is the greatest man I know. I am writing this letter in the hopes that it will help you to see what kind of person my dad is, despite the transgressions that led to this point. Writing this letter is the least I could do for someone as important and influential in my life as my dad is. The world deserves to know how he is my hero, my coach, my biggest fan and, most importantly, my father.*

*Being the first born son, my dad and I share an incredible bond. He instilled values in me as a child that led me to make lasting life decisions. I'm proud to have joined the United States Marine Corps where I served our country and aspired to be the hero I see in my dad. After my years in the Service, I joined the New York City Police Department following my father's footsteps. He taught me that being a police officer is an honor and one of the most important jobs, which made me yearn to be just like him. In high school I asked my dad what made a good cop; he answered, "You should be willing to put your life*

*on the line for all citizens". It is a scary thought but, knowing at one point in his career he put his life on the line everyday made me feel proud and confident every day I wear my badge and serve my community. Because my dad is the kind of person that will put everyone's needs ahead of his own, I was able to emulate his courage in my everyday work…*

*My father cares so much for those he loves and he's the kind of man that will drop everything for a family member or a friend in need. He puts family first, something I will always admire about him. I hope I was able to share with you the sensitive and caring person my father really is."*

(<u>Exhibit H</u>: Gerard Scparta)

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

"*As the youngest daughter I feel that my dad and I have always shared a special bond some may even call me his favorite. I've always been daddy's little girl whether we are going for a bike ride together, to the gym, or just hanging out on the deck he truly is a best friend to me. He is the most selfless person I know and I aspire to be like him as an adult.*

*My dad pushes us all to be the best version of ourselves. I wouldn't have been able to make it through nursing school without the love and support he gave me. I can't even count how many times I would go home from school anxious and crying because I thought I had failed an exam and he would cheer me up. He would go out of his way to make me happy knowing very well that I probably didn't fail the exam and was being dramatic which he was always right about. He would do anything for anyone in his family no matter what toll it could take on him.*

*My dad holds this whole family together I can't picture any event or holiday without him there. He is huge on tradition and has instilled on*

*us the importance of family. He is the person taking care of everyone at all times. His biggest concern is making sure that you are happy. I don't want to have to picture a time without him in our home. It won't be home."*

(<u>Exhibit I</u>: Jenna Scparta)

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

"*My dad and my godfather, Uncle Lenny, are my biggest inspirations in life. They were the best of friends since childhood. On 9/11/01, my*

*uncle Lenny was working as a firefighter at Engine 54 in Manhattan. When those planes struck the towers, without hesitation, my uncle responded to the job. He ran into those towers with no certainty of ever coming out, but that did not stop him. My uncle unfortunately never made it out.*

*My father went to ground zero for two reasons. First, he wanted to help whoever he could during that terrible time. Second, he wanted to find my uncle and his best friend. He stayed there for days looking for my uncle. I was only 5 years old when it happened, but I can never forget the look of sadness on my father's face when he returned…*

*Seeing the outcome of 9/11, what it did to my father, and losing my uncle, made me realize my future. I knew I wanted to be just like my dad and my uncle. I work for the F.D.N.Y. in Manhattan. I do what I do so I can help other people like my father did and so that I can be just as good of a man as he is.*

*I know my father regrets what he has done and I know not a day goes by that he wishes he could take it all back. In my eyes, my father is the best man in the world. I could be so lucky to even be half the man that he is."*

(<u>Exhibit J</u>: Joseph Scparta)

\*      \*      \*      \*      \*      \*      \*      \*      \*      \*      \*      \*

> "*Dedicated is an important word that comes to mind when I think of my father, Gerard Scparta. He was dedicated to his job in the NYPD. He is dedicated to my mother, Maureen Scparta. He is dedicated to our family and all that he has done for us. He is dedicated to our extended family and his friends. He is always someone you can count on no matter what…*
>
> *I wish you had the ability to see my dad through my eyes, in the exact way that I do. If you could, you would see how compassionate, brave, loving, thoughtful, funny, wise and dedicated he is. He is truly the best guy I know. I often like to say "I am my father's daughter" because I like to think that we are a lot alike. Bonding with him is one of my favorite things to do. Whether it's just driving him around while he runs his errands or having a Sunday home with the family, there is truly never a dull moment. He always finds a way to make you laugh, even on your worst days. He reminds you that life is hard, but that it is going to be okay, and he will always be around for help if needed. He also always lets me know how much he loves me and how proud he is of me, even when I feel undeserving of those at the time. So although I like to think we are a lot alike, it's nowhere near true. I could only be so lucky to be like him. He is the person I aspire to be. He is the person I look up to. He is the person that gets me through the bad days. He is the backbone to my family. My family would be broken without him.*"

(<u>Exhibit K</u>: Brianna Scparta)

The sentiments expressed by Gerard Scparta's children have been echoed by others which have witnessed their growth and development under his tutelage:

> "*There is NOTHING he won't do to help his family and friends and he has been such a strong support through our own sadness and challenges.*

*I have always said in life, "if you want to acknowledge someone's strength of character or know what a good person/parent someone is, look at their children and the way they handle their lives." Let me simply say this, I have yet to meet more kind hearted and loving children than his…*

*The way his children live their lives, the professions they have chosen and the kindness they exude in all they do, makes me the proudest AUNT that ever lived. I truly believe and KNOW intensely that this is the beauty of a strong marriage that never gives up when times get hard and the dual incredible parenting skills whose amazing song can be heard from miles away. Seeing Gerard and Maureen together is such a beautiful experience for me and the love they share is inspiring. The bond that they have with each other and with their six children made me want to extend my own immediate family and did very happily."*

(<u>Exhibit L</u>: Tracy Ragaglia)

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

"*I have known him to be a loyal, caring and trustworthy person who is only looking out for the welfare of his wife and children. For as long as I have known him he has always been willing to go above and beyond for his family, his friends and even strangers. After losing his best friend and brother- in- law, Leonard Ragaglia on September 11, 2001 (FDNY Engine 54), he volunteered his time to the rescue and cleanup efforts in the days and weeks following that day. In the years after this event, he has stayed loyal to Lenny's memory by staying in touch with his two children and involving them in all family occasions, as if they were his own. Most importantly, for the time I have known him, he has been a reliable and trustworthy person who has always been devoted to his family, working hard to support them financially and in their pursuit of their own careers.*

*He raised his children with love and support, promoting hard work and instilling the importance of education in order to provide for themselves and eventually families of their own. Five of his six children attended college and all of his six children have pursued careers, which involve helping others, something they learned from Gerard Scparta himself.*

*Of his six children, three of his boys are city workers; one, a New York City Police officer, who served 4 years in the Marine Corps in the MP/K9 unit, one an FDNY EMT and another a custodian at BOCES, public education service organization. Of his three girls, one works as a RN at White Plains Hospital and two work in education, one an Assistant Director/Compliance Coach and one as a Pre- K teacher. As you can see Gerard and his wife Maureen have raised their children to be hardworking citizens who help others."*

(<u>Exhibit M:</u> DanaMarie Ragaglia)

Additional correspondence to the Court from numerous others confirms Gerard Scparta serves as a role model for not only his own family, but within an extended family unit where he serves as an empathetic figurehead providing support for a diverse range of complicated issues:

*"I had met Gerard as a child. He was my son Lenny's best friend and they were always together. Gerard was raised by a wonderful woman who was a single mother. He had no relationship with his father and I felt he was always looking for a male role model in his life. By high school he and Lenny were even closer and he considered Lenny the brother he never had. It was at that time Gerard started calling me "pop". I knew then that I was the father figure he had always longed for and I looked at him as a part of my family. Gerard knew he could come to me with anything and I was always there to lend support and advice. Gerard treated me like his father and was always respectful*

14

*and helpful to me and my wife. It was no surprise when he started dating my oldest daughter and I couldn't have been happier. As a father to a daughter you hope they will find a husband who makes them happy, loves them and cares for them. I took comfort in knowing my daughter would marry a man who was trustworthy, loyal, and hardworking. The day he asked me for her hand in marriage I was more than happy to give them my blessing. My daughter was going to marry a man I trusted and knew would provide for her and their family. I knew Gerard well and had my own personal relationship with him, so when he married my daughter it just made him officially my family. I knew my daughter was in good hands because I had watched him grow and knew what an amazing husband and father he would someday be.*

*Marrying Maureen only made Lenny and Gerard closer, they went into the police academy together and finally fulfilled their dreams of serving and protecting our city. They both knew the dangers of the job but they dedicated their lives to serving others and protecting people because that is the type of men they were raised to be. Gerard worked hard and diligently to provide for my daughter and my six grandchildren. He did what he could to provide for them and spent his free time with his children. It was important to him to make sure his children never felt the way he did growing up and knew they had a father there who loved and cared for them everyday. After Gerard's injury, Lenny followed in my footsteps and became a fireman. On 9/11 we lost Lenny and our family will never be the same. Gerard was especially affected by that day as he had just lost the only brother he ever had. I know that if Gerard was still working on that day we would have lost him too, because that is the type of men they are. They both would stop at nothing to help or save someone and I know Gerard would have run into those buildings without a moment of hesitation, just like my son. September 11th had a profound impact on Gerard's life and I feel that he truly needed counseling to deal with the emotions because this was his family and Lenny was his brother.*

*The days after 9/11 Gerard would volunteer at ground zero to help search for Lenny and any other people who may have been trapped. He would call me daily with updates and always end the conversation with "I love you Pop". Gerard knew at this point he was searching for his remains but that never stopped him from getting up daily to go search. He never gave up hope and wanted to be able to lay his brother to rest properly. That alone showed me what kind of a man he was, even though we weren't blood related he showed so much love for my son and my family and never gave up searching. We never found my son's remains, but Gerard put some soil from ground zero in an urn and gave it to me and my wife. He knew we would never heal from our loss but he had hoped he could give us some closure in this nightmare. He first thought was our feelings and how he could make things better for us. He didn't want us to hurt, he didn't want us to give up and he stayed strong for all of us, even though deep down I knew how much he was truly hurting. In the years following 9/11 I started a small foundation in my son's name, that awarded a college scholarship for a student from his high school. Gerard dedicated his life to keeping Lenny's memory alive. He along with my family would organize a golf outing every year for our foundation to raise money. Gerard would spent months planning and finding sponsors for our event. Over the years we were able to award scholarships to many students all in Lenny's name and most of it would not be possible without Gerard. He knew how much it meant to our family but more importantly how much it would mean to Lenny to be able to help someone in need and that drove him everyday. We will never heal from the loss of our son but he lives on in the memories and stories we share, most of them from Gerard."*

(<u>Exhibit N</u>: Leonard Ragaglia)

16

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

"*Gerard is an amazing husband and father to my six beautiful grandchildren. He was always involved in everything his kids did. Whether it was football, baseball, cheerleading or dance, he supported them unconditionally. He was always the first to volunteer to coach their teams or help in any aspect of their lives. His children mean the world to him and that is something you cannot teach. Growing up with a single mother I knew how important it was to Gerard that he be active in his children's lives. He always wanted them to know they had a father who loved and supported them and would do anything for them. Gerard taught his children the importance of respect and hard work and always pushed them to try their hardest. The love between my daughter and Gerard shows through their six children. I was lucky enough to watch him become a father and see the love and guidance he gives my grandchildren. That child who used to play in my front yard grew up to be the father of my grandchildren, and raised them to be hardworking, respectful young adults.*"

<u>(Exhibit O</u>: Maureen Ragaglia)

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

"*Gerard is my brother in-law, and he has been like a brother for over thirty-five years. It all began while I was very young, and he was my brother Lenny's best friend. He then married my sister Maureen and they brought six amazing children (my nieces and nephews) into this world.*"

*Being one of eleven children and in the younger crew, I babysat their kids all the time. Gerard has always done what ever had to be done in order to raise his kids. When I first got my license, Gerard was the first person to let me drive his car. He trusted me enough to allow me to drive it, and while I was pulling into a gas station to fill it back up,*

*I crashed. I was a nervous wreck, but Gerard was understanding and comforting to make me feel better.*

*Fast forward thirty years, and I am now a single mom with twin girls. Gerard has always made time to attend Father's Day events in my girl's elementary school with them, so they don't feel different and never feel like they don't have anyone there for them. Every time we have moved in the last five years, he has always been there for us and has helped us move our entire house, along with his boys. Believe me when I tell you that's no easy task, but again just proving what a selfless, caring, and helpful human he really is...*

*Gerard was not only a father to his six children, but he was a father figure to my brothers two boys, my little brothers, and now to my kids as well. It takes a special kind of man to be able to take all of that on, but Gerard did all with no questions, and because of that, it shows the type of amazing human being he is."*

(<u>Exhibit P</u>: Debra Ragaglia)

\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*

*"Gerard has been in my life since I could remember. For over 30 years. He really is a big brother to me. As a child growing up, I have fond memories of Gerard and my oldest brother Lenny always together. They were best friends. Gerard was in our house all the time. He eventually started dating my sister, they got married and had six children. He and my sister have raised their kids to be respectful and with the utmost manners. They all have made careers for themselves that any parent would be proud of.*

*Gerard has always been a family man, Caring, giving and kind. With him being an only child raised by a single mother and coming into my family of 11 siblings now, he has always treated us as his own. He will lend a helping hand or support to all of us when in need.*

█████████████████████████████████████████ *Gerard and a few of his friends grew beards and raised $1,000 to help us with medical bills. This is just the kind of person he is. She is now almost six years old and a blessing to our family.* ████████████
██████

(<u>Exhibit Q</u>: Colleen Ragalia)

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

"*I have known Gerard for almost 10 years, ever since my wife Colleen and I started our own family. In all that time knowing my brother Gerard, two things stick out about him the most. His optimistic personality where he always makes light of any difficult situation and, his devotion to his family and all the loved ones in his life. I heard stories of how Gerard cared for our family and went to extreme measures during 9/11, a day that forever changed our family. It was a traumatic time where my wife lost her older brother and Gerard's best friend, Firefighter Lenny Ragaglia, who was a first responder that morning. The stories sound legendary, and that's because my brother Gerard gives unconditionally. He dedicates himself unselfishly to his family especially difficult times.*



*. As a father receiving such news about my infant daughter I felt desolate, fearful, and hopeless. During that dark time where we were learning cope and care for our daughter's special needs, I'll never forget the acts of kindness and supportive talks I had with my brother Gerard. I experienced first-hand, just how incredible, given, and kind-hearted of a person he is. He is a crucial part of how I focused on what I could control and that was my daughter's happiness and quality of life. Amazingly,* ████ *is turning 6 in a few days and will be graduating kindergarten in June. She is madly in love with her uncle Gerard and Aunt Maureen.*"

(<u>Exhibit R</u>: David Ibrahim)

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

> *"As I grew older I continued to learn valuable lessons from Gerard. He always taught me how important family was and what it meant to be there for them in times of need. Gerard was very good friends with my brother Lenny who was the 3rd oldest of my siblings. I have heard many stories about how the two of them were inseparable growing up together. My brother Lenny was a fireman who was one of the first to respond on the morning of September 11th. After the towers collapsed my brother was classified as missing. Despite the dangers that were present, Gerard selflessly searched alongside fellow first responders for my brother and any victims that needed to be rescued. He worked tirelessly day after day doing everything he could because thats the type of person he is. Unfortunately my brother was never found and that took a big toll on my family including Gerard. Ever since my brothers passing Gerard has gone above and beyond to help the family out in anyway he could including helping to organize and run a golf outing that was held every year in memory of my brother. Also he has spent every one of his own birthdays and my brothers birthdays stopping by the cemetery to celebrate with him as they would have done if he was still here."*

(Exhibit S: Stephen Ragaglia)

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

> *"I feel like he grew up with my siblings and me, he was an only child and we were a large family. I have 11 siblings and Gerard eventually became best friends with my brother Lenny and from that moment on they were inseparable. They worked together played sports together and were really the best of friends. When my sister married Gerard we were all thrilled after all he was already a part of our family.*
>
> *Unfortunately my brother and Gerard's best friend died on September 11th and I don't expect anyone to understand the profound impact that has had on everyone in my family including Gerard. It was impossible to fathom how truly horrible that scene was, yes we saw it on television but seeing it in person is something I will never forget. The reason I'm telling you this is because from the moment those towers*

*fell Gerard went straight to ground zero and that comforted us because we knew that we had somebody looking for my brother. It took about a week before I started to realize that we weren't going to get my brother back, I was praying that he was trapped and they just didn't get to him yet. Gerard would call every day and even come back to my parents' house to shower and go right back to ground zero. I would ask him to take flyers that I made and put them up because we were holding onto hope. He never once said no or you're wasting your time, which is what I realized after about a month when the fire department took family members to the recovery site and my heart broke. How could I have been so stupid to believe that someone could have survived this and then I realized that Gerard did an amazing job of keeping us hopeful and delaying our inevitable pain and all this while suffering on his own. He put my entire family before himself and I am truly grateful to have him in our family."*

(Exhibit T: Linda Ragaglia-Taccetta)

\*　\*　\*　\*　\*　\*　\*　\*　\*　\*　\*　\*



*He always made it a point to talk to me about what was going on in my life and ask me questions. I have been involved in theatre my whole life and even now I am still a director. My Uncle Gerard has always supported me and believed in my dreams. Even when no one else did or cared. He and my aunt would drive two hours to Staten Island just to see shows I directed. He will never understand what that means to me. They didn't have to go out of their way to come to my shows but he did because he loves me and wanted me to know that he supports me in everything I do. Not only because I am his nephew but because it was important to him that I knew he would always be there for me and he believed in me. I*

*have family members who live on Staten Island who have never seen one of my shows, but my Uncle Gerard never thought twice about dropping everything and traveling two hours just to support me. That is a feeling I can't even explain. Theatre is my life and my career and having my uncle support me in that way means the world to me.*



*My Uncle Gerard was always there to remind me how loved I really am."*

(<u>Exhibit U</u>: Michael Taccetta)

While serving as patriarch of this extended family unit, Gerard Scparta has concomitantly maintained gainful employment as a security guard through Cadre Investigative Consultants. He works six days a week, Monday through Friday from 3:00pm until Midnight and on Saturdays from 7:00am until 7:00pm.

Indeed, Mr. Scparta humbly travels two hours each way by bus to and from midtown Manhattan knowing that - due to his legal problems - a commute of this magnitude pales in comparison to his extreme gratitude for the opportunity to work, support his family and make good on his financial obligations to the Government related to the instant offense.

Similar to the manner Gerard Scparta has shown himself to be a credit to his family, his employer has seized the opportunity to confirm the manner in which Scparta has proven himself to an asset to that business:

> "*My Name is Michael J Connolly. I am a retired New York City Police Department (NYPD) Detective. Upon retirement in February 2005, I formed Cadre Investigative Consultants PI, an insured, bonded and licensed investigations and security company based in New York. On June 18, 2018 I hired Gerard Scparta. Prior to hiring Gerard, I was aware of his legal problems. I have known Gerard in a personal and professional capacity for over 20 years. Since hiring Gerard, he has been an instrumental contributor to my company. Gerard always arrives on time, oftentimes at least '/2 hour before his scheduled shift starts…*
>
> *In his capacity as a Security Officer with my firm, Gerard is responsible for the safety and security of employees of my client at two Manhattan office buildings. In these regards, Gerard has full access to these two buildings including keys to the buildings and access codes to the security systems. Gerard's duties encompass performing walking tours of these buildings during which he will identify any safety issues as well as deter, identify and combat theft. At the end of his shift, Gerard is entrusted with locking and securing the building for the evening.*"

> <u>(Exhibit V</u>: Michael J Connolly)

A Defendant's familial responsibilities are a necessary and permissible factor in providing leniency in sentencing (see <u>U.S.S.G §5H1.6</u>; <u>United States v. Alba</u>, 933 F 2d 1117 (2nd Cir. 1991) (*living with dependent relatives*).

This philosophy is predicated upon the fact that the "*family circumstances caselaw of this and other circuits recognizes that courts should…attempt to build procedures, dispositions, and structures that foster*

*extended family responsibilities*". United States v. Rose, 885 F. Supp. 62, 63 (E.D.N.Y. 1995).

Both Gerard Scparta's immediate as well as his extended family would be the intended beneficiaries of any leniency provided by this Court on family circumstances grounds inasmuch as they are individuals whom the defendant has demonstrated long term devotion and commitments. United States v. Londono, 76 F. 3d 33, 36 (2nd Cir. 1996) (Court of Appeals recognized that a defendant's family responsibilities may present such circumstances that leniency is necessary and permissible).

In cases such as this, the reduction or elimination of a custodial sentence allows a defendant to continue to discharge his existing family responsibilities.  See e.g. United States v. Rivera, 994 F. 2d 942 (1st Cir. 1993); United States v. Alba, 933 F. 2d 1117 (2nd Cir. 1991); United States v. Johnson, 964 F. 2d 124 (2nd Cir. 1992). United States v. Cho, No. 08-CR-332, 2009 WL 5322746, at *2 (E.D.N.Y. Oct. 6, 2009); United States v. Alequin, No. 07-CR-00810, 2008 WL 3009962, *1-2 (E.D.N.Y. June 16, 2008) (imposing a below-Guidelines sentence on defendant who pleaded guilty to importing heroin because he was a "*gentle person*" who "*worked hard for his family*").

Leniency in such instances serves to "*reduce the destructive effects that incarceration of a defendant may have on innocent third parties*". United States v. Milikowsky, 65 F. 3rd 4 (2nd Cir. 1995).

As detailed above and in the enclosed, Mr. Scparta's removal from the family unit will terminate the familial responsibilities he has passionately shouldered and, as of the date of this Sentencing Memorandum, continues to diligently discharge.

### (C)   Gerard Scparta's Acceptance of Responsibility and the Potentially Onerous Collateral Consequences of a Custodial Sentence

Gerard Scparta has openly accepted responsibility for his actions and stands before this Court with a sincere desire to place his conduct behind him. Consistent with this philosophy, he has already amended his tax returns and completely satisfied his prior income tax arrears for years 2012, 2013 and 2014. Likewise, he has made partial payment towards his 2015 obligations.

We respectfully submit that the personal penance paid by Mr. Scparta - as well as that which he will continue to pay throughout his future path of internal accountability - is not necessarily conducive to objective evidentiary evaluation by third parties.

Notwithstanding this fact, a costly lesson has indeed been learned by Mr. Scparta as is best expressed to the Court in his own words:

> *"My name is Gerard Scparta and I write this letter with a great deal of shame and remorse about my bad decisions. I am a former NYPD officer. My law enforcement training makes this easy for me to understand. I violated the law. Now I must accept my punishment with humility and grace. What I did was criminal and there is no excuse for my conduct. Knowing that justice will be done, I can focus on a process of atonement. I know that I will spend the rest of my life making amends and restitution…*
>
> *Your Honor I am deeply remorseful for all of my actions. I take full responsibility for all of my bad decisions. I am very sorry to all of my victims especially the United States Government and Social Security Disability System. I am also heartbroken over what I did to my family. I told so many lies to my wife that I lost track of the truth. To my kids starting their careers, I have disgraced their name by my actions. My crimes will be on the internet forever. This I deeply regret and will have to live with for the rest of my life…*

*In the future, I hope I can use this painful experience to help others avoid my mistakes."*

(Exhibit D: Gerard Scparta)

## (D) The Sentencing Commission's Most Recent Sentencing Statistics and the Principle of Equitable Proportionality in Sentencing

We respectfully submit that one of the paramount objectives of federal sentencing is to reduce disparities and promote proportionality in sentencing.

As we trust the Court is aware, the United States Sentencing Commission publishes abstracts of federal sentencing statistics which examine federal sentencing statistics from each judicial district, the districts within each judicial circuit, and the districts within each state. The figures in the most recent report cover the period of October 17, 2017 through June 30, 2018 (the "2018 Report")(Exhibit W) confirms that the Sentencing Guidelines do not represent the predominant factor in a decisive majority of Southern District of New York sentences.

The 2018 Report confirms that 66.9% of sentences in the Second Circuit were below the calculated Guidelines range. Indeed, the overwhelming majority of sentences in the Southern District of New York - 73.8% - were below the calculated Guidelines range. Id. Only 26.2% of the sentences in this District fell within the Guidelines. Id.

Thus, throughout the Second Circuit and specifically within the Southern District of New York, a sentence below the Guidelines range is the prevailing norm as opposed to the exception.

Moreover, recent precedent confirms that former New York City Police Department officers convicted of offenses analogous to Mr. Scparta have received below guideline range sentences consisting of Probation (see e.g. United States of America v. James Carson, Southern District of New York, October 15, 2015). In Carson, the Court sentenced the defendant to five years' probation and 300 hours community service for his receipt of

over $300,000 in social security disability benefits while a corporation established under his wife's name received up to $138,000 a year in compensation related to his position as Security Director for Tourneau Jewelry from 2004 through 2012. As in the instant matter, the defendant's remorse, respect for the law, low risk of recidivism and the adequate deterrent effect of supervised release as well as the restitution order were §3553(a) factors militating in favor of a non-custodial disposition despite the identical Assistant United States Attorney assigned to this matter strenuously seeking a jail sentence as high as 24 months.



Consistent with the foregoing, we respectfully submit that a sentence within Mr. Scparta's advisory Guidelines range would not only discount the operative §3553(a) factors discussed above but also defy certain empirical realities of both this respective Circuit as well as District.

### Conclusion

The Sentencing Commission had itself "*stressed the difficulty of prescribing a single set of guidelines that encompasses the vast range of human conduct potentially relevant to a sentencing decision*". United States v. Merritt, 988 F 2d at 1309 (2nd Cir. 1993) [quoting U.S.S.G. Guidelines Manual, Ch. 1, Pt. A, intro. cmt. 4(b)].

Cognizant of this fact, the Court pronounced in United States v. Lara, 905 F. 2d 599, 604 (2nd Cir. 1990) that "*it was not Congress' aim to straitjacket a sentencing court, compelling it to impose sentences like a robot inside a glass bubble, and preventing it from exercising discretion, flexibility and independent judgment*".

It has not escaped defense counsel that decisions regarding whether or not individuals should be afforded leniency in contemporary society are increasingly difficult. However, Gerard Scparta is held in high regard by his family, friends as well as peers and possess numerous positive attributes as referenced above and in the enclosed additional correspondence to the Court (Collective Exhibit X: Maria Gross, Vincent Durante, Lauren LaCapria, Christine Durante, Vincent Tuzzalo, Joseph Carver, Michael Pucciarelli, Michael Fumarola and Edward Souto).

In closing, we believe the words of family friend Joseph Fumarola provide the Court with the most poignant impression of Gerard Scparta:

> *"When I think of Gerard Scparta, I am not thinking of the poor choice he made, I am thinking of all the good choices he has made, for example, raising his family, and always willing to lend a hand to someone in need. The Scpartas have improved my life with their overwhelming love, laughter and kindness. I feel I am a better person, as well as a better father for having the great privilege of knowing him and the high importance he places on family."*

(Exhibit Y: Joseph Fumarola)

In light of the above and enclosed, we submit that a term of Probation with additional conditions of the Court's discretion would be sufficient, but not greater than necessary, to comply with the sentencing purposes set forth in §3553(a)(2). Accordingly, such a sentence would represent a fair and reasonable non-guideline sentence. We respectfully submit that a custodial sentence of this particular defendant may prove unduly harsh and far more harmful than warranted.

After being arrested for the instant offense in April 2018, Gerard Scarpata's lengthy pre-trial supervision has been incident free. We are therefore confident that Mr. Scparta possesses the personal fortitude and respect for the Court to comply with any terms and conditions of Probation.

Such supervision, "*rather than an act of leniency, is a substantial restriction on freedom*". <u>Gall v. United States</u>, 128 S. Ct. 586 (2007) (rejecting an appellate rule that requires extraordinary circumstances to justify a sentence outside the Guidelines range as well as the use of rigid mathematical formulas) .

We thank you for your continued consideration in this matter.

Respectfully Submitted,

*Joseph Mure, Jr.*

Joseph Mure, Jr., Esq.

cc:   A.U.S.A. Sagar K. Ravi, Esq.