UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

UNITED STATES OF AMERICA :

- v. - : S1 18 Cr. 578 (AJN)

GERARD SCPARTA, :

Defendant. :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**SENTENCING MEMORANDUM OF THE UNITED STATES OF AMERICA**

GEOFFREY S. BERMAN
United States Attorney for the
Southern District of New York
Attorney for the United States of America

Sagar K. Ravi
Assistant United States Attorney
- Of Counsel -

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

UNITED STATES OF AMERICA :

- v. - : S1 18 Cr. 578 (AJN)

GERARD SCPARTA, :

Defendant. :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**SENTENCING MEMORANDUM**

The defendant in the above-captioned case is scheduled to be sentenced on Friday, August 9, 2019 at 2:00 p.m. The Government respectfully submits makes this submission in connection with the sentencing and in response to the defendant's sentencing submission filed on August 2, 2019 ("Def. Mem."). The Government has also attached a Victim Impact Statement as Exhibit A to this submission ("VIS").

As an initial matter, the Government does not have any objections to the Presentence Investigation Report revised on July 3, 2019 (the "PSR"), which determined that the defendant's applicable United States Sentencing Guidelines (the "Guidelines") range is 30 to 37 months' imprisonment and recommended a sentence of two years' imprisonment.

For the reasons set forth below, the Government respectfully requests that the Court impose a sentence of imprisonment within the Guidelines range of 30 to 37 months' imprisonment pursuant to the factors set forth in 18 U.S.C. § 3553(a). This is a sentence that is sufficient but not greater than necessary to serve the purposes of sentencing and would be fair and appropriate in this case.

## I. BACKGROUND

### A. Offense Conduct

For over twenty years, from at least 1997 through 2017, the defendant Gerard Scparta defrauded the Social Security Disability Insurance ("SSD") program by obtaining over $630,000 in SSD benefits to which he was not entitled through false statements in his initial application for benefits and repeated lies thereafter to the Social Security Administration ("SSA") about his purported inability to work due to an invented disability.

Beginning in 1986, the defendant worked as a police officer with the New York City Police Department ("NYPD"). In 1997, after reportedly sustaining an injury and claiming a disability, he stopped working as a police officer and retired at age 32. In or around the same time, the defendant was referred by a confidential witness ("CW-1") to another individual ("CC-1") who assisted officers in submitting applications for SSD benefits that contained false statements regarding their purported disabilities.

In May 1998, the defendant worked with CC-1 to submit an application for SSD benefits alleging disability from February 28, 1997 onward which contained false statements that the defendant suffered from severe depression and anxiety, could not do anything around the house, and was unable to work in any capacity. Notably, in order to provide medical documentation supporting his purported disability, the defendant also made false statements to physicians that examined him and submitted reports to the SSA. For example, in a June 27, 1998 examination by a physician, the defendant pretended that he did not know where he was, could not remember the last four vice presidents, and had trouble repeating numbers that were told to him. As part of the SSD application, the defendant agreed that he would inform the SSA if his medical condition improved or he returned to work, and he was informed that any false statements to the SSA

would subject him to federal criminal penalties, including imprisonment. Based on the false statements and representations in the SSD application that the defendant submitted, he began receiving SSD benefits from March 12, 1999 onward, and received benefits retroactive from February 28, 1997. In exchange for the assistance that CC-1 provided to the defendant in submitting a fraudulent application for benefits that got approved, the defendant paid a kickback of 13 months of the SSD benefits he received in cash increments to CW-1, who paid over nine months of benefits to CC-1 while retaining the remaining four months of benefits.

In at least April 2004, while the defendant was continuing to receive SSD benefits, the defendant was hired to work at a strip club in Manhattan (the "Strip Club") as a security guard or "bouncer," providing access and egress control, responding to disorderly patrons, and checking identification, among other duties. At times, the defendant also worked as an administrator of private rooms, for which he collected money from customers and accounted for time and alcohol sales. During his work as a bouncer, for three years through January 2007, the defendant earned over $48,000, while he was also receiving SSD benefits.

Starting in January 2007, the defendant began a new role with the Strip Club as an independently contracted host, greeting customers, liaising between female entertainers and customers, and taking care of customers at tables of VIP rooms at the Strip Club. As a host, the defendant generally worked standing up and frequently walked around the Strip Club while on a shift generally running from 6:00 PM to 3:30 AM. During his work as a host, for the period from 2009 to 2016, the defendant earned gratuities from customers or female entertainers totaling over $1.6 million, while he was also receiving SSD benefits. Importantly, Scparta was never paid directly for his work at the Strip Club, but rather was paid through a limited liability

company called M.E.S. Consulting, LLC ("MES Consulting"), which was registered to Scparta's wife even though his wife did not work at the Strip Club.

Despite working both as a security guard and host for more than ten years from 2004 to 2017 and receiving periodic notices from the SSA informing him of the requirement to report if he returned to work, Scparta did not inform the SSA that he was working, as he was required to do. Instead, the defendant affirmatively lied to the SSA multiple times about his inability to work due to disability so that he could continue to receive hundreds of thousands of dollars in SSD benefits. From 2002 through at least 2008, Scparta provided SAA with periodic forms that falsely stated, among other things, that he was not employed, was "unable to do anything in or out of the house," "nap[s] on or off during the day," and "do[esn't] have an interest in anything." The defendant even went as far to falsely state in these forms that he "avoid[ed] people" and no longer drove an automobile or took public transportation, even though he was regularly driving to and from his work at a crowded strip club.

In 2016, as a part of an in-person interview with the SSA related to continued receipt of SSD benefits, Scparta submitted a "Work Activity Report" to the SSA in which he falsely represented that since 1997 he had no employment or self-employment, even though he had worked at the Strip Club for twelve years by that point. He also submitted a "Continuing Disability Review Report" in which he reported that his typical day consisted of having coffee, watching TV, and trying to sleep. He also reported having difficulty taking medicines, preparing meals, managing money, concentrating, and remembering. These lies were particularly egregious given that, at the time he submitted these forms in 2016, the defendant was working, effectively, full-time at the Strip Club, for which we was earning an income exceeding six

figures over a period of six years, even earning as much as approximately $377,000 the year before his in-person interview with the SSA.

On January 13, 2017, prior to being charged in this case, Scparta informed the SSA that he was employed at the Strip Club, but as a "Greeter" who had only started working on January 1, 2017. Scparta had been working at the Strip Club for more than 13 years by the time he made this latest false statement to the SSA in an apparent attempt to report his employment while not getting caught for his past two decades of criminal activity. Scparta also lied that he was working only 18 hours per week at an hourly rate of $20. Subsequent to this notification, the SSA discontinued his SSD benefits.

Finally, on the tax returns that the defendant filed jointly with his wife, his wife was listed as the "Proprietor" and only employee of MES Consulting, the entity through which the defendant was paid for his work at the Strip Club. Scparta and his wife represented to their tax preparer ("Tax Preparer") that Scparta's wife provided security at the Strip Club, and that Scparta was unable to work for MES Consulting due to his disability and as such had no role at MES Consulting. While his wife reported the profit from MES Consulting on their joint income tax returns, the defendant did not otherwise report any wages, salaries, or tips relating to his work. Accordingly, by using MES Consulting, which was registered to his wife, the defendant sought to ensure that his work activity would not be disclosed to the Government on his tax returns. Moreover, along with concealing the source of the income, Scparta underreported the income he earned by a total of $268,602 for the years from 2012 to 2016.

In total, from 1997 to 2017, the defendant fraudulently received approximately $638,586 in SSD benefits, while actively working and lying to the SSA about his purported inability to

work. For the period from 2012 to 2016, the defendant also underreported the income earned from the Strip Club for a total tax loss of $87,931.

**B. The Defendant's Plea and Applicable Guidelines Range**

On April 15, 2019, the defendant pleaded guilty pursuant to a plea agreement with the Government (the "Plea Agreement") to one count of theft of government funds, in violation of 18 U.S.C. § 641 ("Count One"), and one count of tax evasion, in violation of 26 U.S.C. § 7201 ("Count Four").

The Plea Agreement calculated the defendant's Criminal History Category as I, and the applicable Guidelines offense level as 19. The base offense level for Count One of the Superseding Information was six pursuant to U.S.S.G. § 2B1.1(a)(2). Pursuant to U.S.S.G. § 2B1.1(b)(1)(H), because the amount of loss exceeded $550,000 but did not exceed $1,500,000, a 14-level increase was warranted. Pursuant to U.S.S.G. § 2B1.1(b)(10)(C), because the offense otherwise involved sophisticated means and the defendant intentionally engaged in or caused the conduct constituting sophisticated means, a two-level increase was warranted. The base offense level for Count Four of the Information was 16 pursuant to U.S.S.G. § 2T1.1(a)(1). Pursuant to U.S.S.G. § 2T1.1(b)(2), because the offense involved sophisticated means, a two-level increase was warranted. However, pursuant to U.S.S.G. § 3D1.2(d), Counts One and Four are grouped (the "Group") because the offense level is determined based on the total amount of harm or loss. As the Guideline for Count One produces the highest offense level, the applicable offense level for the Group is 22. After a two-level reduction in the offense level due to the defendant's acceptance of responsibility and a further one-level reduction based on timely notice of his intention to enter a guilty plea, the total offense level is 19. This calculation resulted in a Guidelines range of 30 to 37 months' imprisonment.

The defendant also agreed to forfeit a sum of money equal to $638,586 representing the amount of proceeds the defendant personally obtained as a result of Count One, and a sum of money equal to $87,931 representing the amount of proceeds the defendant personally obtained as a result of Count Four, for a total forfeiture of $726,517. In addition, the defendant agreed to make restitution in the amount of $726,517, according to a plan established by the Court. Finally, the parties also agreed in the Plea Agreement that neither a downward nor upward departure from the Stipulated Guidelines range is warranted.

In the PSR, the Probation Department conducted the same Guidelines calculation and also concluded that the defendant's applicable Guidelines range is 30 to 37 months' imprisonment. (PSR ¶¶ 54-65, 114).

## II. APPLICABLE LAW

The Guidelines still provide strong guidance to the Court following *United States v. Booker*, 543 U.S. 220 (2005), and *United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005), although they are no longer mandatory. "[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range" – that range "should be the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007). As the Second Circuit has noted, although the Guidelines do not dictate a presumptively reasonable sentence, they are not merely a "body of casual advice." *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (en banc) (internal quotation marks omitted).

After making the initial Guidelines calculation, a sentencing judge must then consider the seven factors outlined in Title 18, United States Code, Section 3553(a): (1) "the nature and circumstances of the offense and the history and characteristics of the defendant;" (2) the four legitimate purposes of sentencing, as set forth below; (3) "the kinds of sentences available;" (4)

the Guidelines range itself; (5) any relevant policy statement by the Sentencing Commission; (6) "the need to avoid unwarranted sentence disparities among defendants;" and (7) "the need to provide restitution to any victims." 18 U.S.C. § 3553(a)(1)-(7); *see Gall*, 552 U.S. at 50 & n.6.

In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2). To the extent the Court imposes a sentence outside the range recommended by the Guidelines, the Court must "'consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance.'" *Cavera*, 550 F.3d at 189 (quoting *Gall*, 552 U.S. at 50).

**III. DISCUSSION**

In his sentencing submission, the defendant seeks a sentence of probation. Specifically, the defendant argues that the factors laid out in Section 3553(a) weigh in favor of a sentence of probation due to the defendant's history and characteristics, particularly his contributions to his family and community. However, neither probation nor the 24-month sentence recommended by the Probation Department are sufficient for this fraud that spanned two decades, resulted in a loss of over $630,00 in disability benefits, and involved sophisticated steps to both conceal the fraud and to evade taxes on the over $1.6 million in income the defendant earned while committing this fraud. Accordingly, the Government respectfully submits that the Section 3553(a) factors

warrant a sentence of imprisonment within the Guidelines range of 30 to 37 months. Those factors include the need for the sentence to reflect the seriousness of the offense, to provide just punishment for the offense, and to afford adequate deterrence to criminal conduct and promote respect for the law.

**A. The Seriousness of the Offense and the Need for Just Punishment**

First, a sentence within the Guidelines range is necessary to reflect the seriousness of the defendant's conduct and to provide just punishment for the defendant. The defendant perpetuated a fraud for two decades, repeatedly lying and misleading the SSA to fraudulently acquire more than $630,000 in funds that would otherwise have been distributed to the 8.5 million qualifying Americans struggling with genuine disabilities. (VIS at 1.) Not only did he lie about his disability in order to obtain benefits in the first place (while providing a substantial kickback to those who helped him with his fraudulent application), but he continued to lie over the next 20 years in order to continue receiving benefits and to avoid getting caught. The lies themselves were brazen – the defendant claimed he could not drive or do anything around the house and that his wife even had to get him to shower and shave, when he was in fact driving to work regularly and working full-time as the host of the Strip Club.

The defendant further committed this egregious fraud even as he earned a six-figure income that provided a more than comfortable lifestyle for himself and his family. Not satisfied with his ill-gotten gains from the SSA and his lucrative job at the Strip Club, the defendant compounded his fraud and chose to underreport his income on his tax returns by approximately $268,000 to enhance his personal wealth at the expense of the general public. Putting aside the time and resources that were necessary to investigate the fraud in this case, the defendant's fraudulent conduct caused real harm to the community by taking crucial funds away from the

SSA and Treasury Department and significantly undermining the confidence of the public in programs like SSD administered by the SSA.

The defendant tells the Court in his letter that he got involved in this fraud due to "bad advice" from two former colleagues during a period of financial stress. (Exhibit D to Def. Mem.) But this was not simply about the defendant following "bad advice" – the defendant lied repeatedly in his application for SSD benefits about his mental condition and severe depression and anxiety, even pretending in front of physicians examining him that he did not could not remember where he was or who the vice president was. The defendant further states in his letter that he hopes the Court will see him not as "a greedy person, but a foolish one." (*Id.*) But again, the defendant is no fool and did not stumble onto this fraud – he knew exactly what he was doing and took sophisticated steps to conceal the fraud by having his income paid to a corporate entity registered to his wife and lying to his tax preparer in order to underreport his income (the income represented to be his wife's) by hundreds of thousands of dollars. Finally, the defendant acknowledges that he made another "bad decision" by starting work again and not reporting it and that he "truly wanted to stop receiving disability benefits for many years." (Exhibit D to Def. Mem.) But this rings hollow given the extended duration of this fraud and who the defendant is. As a former law enforcement officer, the defendant certainly knew whom to contact if he really wanted to come clean about his conduct. Indeed, the defendant himself did find a way to stop receiving benefits in 2017, but this was only after he had been committing the fraud for almost 20 years and he only did so by lying one more time to the SSA – that he only started working earlier that year.

This fraud is also not an aberration in the defendant's judgment. Not only did the defendant commit this fraud for two decades with repeated false statements to the SSA, but he

continued this fraud even after he had to have learned of fellow officers being arrested for the very same crime and working with the same individuals who helped him submit his fraudulent application for disability benefits. The arrests by the state of more than 100 officers and firefighters engaged in this type of fraud was well-publicized as early as January 2014,[1] and the defendant, in the face of clear proof of his own crimes and the risk of his activities to himself and his family, persisted in his criminal activity for another three years.

Moreover, the defendant actually demonstrated an escalating pattern of greed. The defendant's criminal activity began in 1997, fraudulently claiming disability but also not working. At this stage, outside other investigations, it would likely have been difficult for the SSA to otherwise uncover that the defendant was defrauding the Government. However, beginning in 2004, the defendant returned to work, in a physically demanding job supporting the Strip Club as a bouncer. Then in 2007, he took on leading role within the Strip Club and was well compensated with a six-figure income. Finally, beginning in at least 2012, the defendant began to underreport his income, in an attempt to line his pockets with even more money from criminal conduct. Even at the stage when the defendant was earning six-figures from his job and still collecting a disability pension from the NYPD of approximately $4,500 a month, he decided to persist in defrauding the SSA and disabled Americans. The defendant did not make a one-time mistake but pursued personal gain and demonstrated increasingly fraudulent behavior over the course of two decades.

---

[1] *See e.g.*, *Charges for 106 in Huge Fraud Over Disability*, N.Y. Times, Jan. 7, 2017, at A1, *available at* https://www.nytimes.com/2014/01/08/nyregion/retired-new-york-officers-and-firefighters-charged-in-social-security-scheme.html; *Indictments for 28 More in Fraud Case*, N.Y. Times, Feb. 24, 2014, *available at* https://www.nytimes.com/2014/02/25/nyregion/indictments-for-28-more-in-fraud-case.html; *Ex-Police Officer Pleads Guilty to Playing Role in a Disability Fraud Scheme*, N.Y. Times, Aug. 27, 2014, *available at* https://www.nytimes.com/2014/08/28/nyregion/ex-officer-pleads-guilty-in-disability-fraud-scheme.html.

The defendant focuses at length in his sentencing submission on his regret for committing these crimes and his contributions to his family and his community as well as his service in connection with the 9/11 attacks, but these considerations neither excuse nor explain the criminal conduct that he committed at the same time and do not lessen the seriousness of his conduct. Indeed, it was due at least in part to the fraud he committed that the defendant was in a position to provide the financial support to family members documented in some of the letters submitted to the Court. As a former law enforcement officer entrusted with protecting the public from the same crimes as those he committed, the defendant should be held to a higher standard. The Government also notes that the defendant's lack of criminal history and acceptance of responsibility were taken into account in the calculation of his Guidelines range, and although the defendant is a first-time offender, he was committing this fraud for the past twenty years.

For the reasons set forth above, the seriousness of the defendant's conduct and the need for just punishment warrant a sentence within the Guidelines range.

**B. The Need for Specific Deterrence and to Protect the Public**

Second, a sentence within the Guidelines range is necessary to afford adequate deterrence to the defendant and to protect the public from further crimes. The defendant committed his crimes despite having the love and support of a large number of family members and friends and despite knowing full well the consequences of his criminal actions. Further, as noted above, the arrest of dozens of his fellow officers and firefighters did not deter the defendant from continuing his crimes, even during a period of time when he was making over six figures a year from his work at the Strip Club. Considering the defendant's large current debts, limited net worth, and the large restitution obligations he will be responsible for, it is all but certain that the defendant will again find himself in a situation of financial stress. Accordingly, a custodial

sentence within the Guidelines sentencing range is necessary to discourage the defendant from again resorting to fraud and would impress upon him the serious consequences of his criminal conduct.

**C. The Need for General Deterrence and to Promote Respect for the Law**

Third, a sentence within the Guidelines range is necessary to afford adequate deterrence to criminal conduct and to promote respect for the law. The defendant is requesting to be sentenced to probation. But a probationary sentence would not demonstrate that crimes such as the instant offenses are taken seriously. Instead, a prison sentence within the Guidelines range is necessary to send a message to other similarly situated individuals and the public that lying to the SSA, stealing over $630,000 reserved for those with genuine disabilities, and underreporting your taxes entails risks greater than simply being supervised and paying back what was illegally taken. The Government recognizes that the defendant's incarceration will have a significant toll on his family, both financially and otherwise, but that hardship is not so severe in degree or in kind to warrant a variance from the Guidelines. Moreover, this is not a situation where the defendant is the sole provider for minor children or for family members that depend on his care for their daily needs. All of the defendant's children are of adult age, gainfully employed, and appear to be in good health. In addition, the defendant still appears to be collecting a monthly pension of approximately $4,500 a month (PSR ¶ 103) and the large number of letters from friends and family demonstrate that the defendant and his family have a support network to assist them while he is incarcerated.[2]

[2] To the extent the defendant is seeking a sentence of probation based on his current conditions of depression, anxiety, and PTSD, these conditions can be adequately treated by the Bureau of Prisons, which carefully considers the offender's health status, assigns each inmate a medical "Care Level," and has facilities and staff that are available to provide for such care. (*See* Legal Resource Guide to the Federal Bureau of Prisons (2014) at 25-28, *available at* https://www.bop.gov/resources/pdfs/legal_guide.pdf.)

**D. A Sentence of Probation Is Wholly Inadequate**

Finally, the defendant's argument that probation would be consistent with the sentence imposed in *United States v. Carson*, 14 Cr. 821 (ALC), is misplaced. (Def. Mem. at 26-27.) In that case, James Carson, also a former NYPD officer, was responsible for fraudulently obtaining approximately $300,000 in SSD benefits over a 10-year period while he was working as the director of security for a watch company and earning between $27,000 and $138,000 annually that was paid to an entity registered to the defendant's wife. While the Guidelines range in *Carson* was 18 to 24 months' imprisonment, the Court sentenced Mr. Carson to five years' probation, which was consistent with the Probation Department's recommendation in that case. Scparta's criminal conduct is distinguishable from *Carson* in a number of respects, the most notable being that (1) Scparta caused more than double the loss to the SSA; (2) Scparta's fraudulent scheme lasted a decade longer; (3) Scparta had earned a total of more than $1.6 million from the work he concealed from the SSA; and (4) Scparta also underreported the income earned on his taxes by hundreds of thousands of dollars. Most importantly, however, while Mr. Carson's criminal conduct involved his false statements to the SSA regarding his employment and ability to work, there was no allegation that Mr. Carson's application for disability benefits was fraudulent or that he improperly received benefits during the fourteen years prior to when he started working. In contrast, in this case, Scparta engaged in a scheme to defraud the SSA from the day he submitted his application for disability benefits containing false statements in 1998 – in other words, every dollar that Scparta received from the SSA constituted proceeds of fraud.

A more recent but still not analogous precedent for the Court to consider is *United States v. Maraio*, 18 Cr. 410 (SHS), which also involved a former NYPD officer and firefighter who

fraudulently obtained approximately $360,000 in SSD benefits over a 10-year period while he earned a total of approximately $450,000 through work that was paid to an entity registered to the defendant's wife. Faced with a Guidelines range of 18 to 24 months' imprisonment, the Court sentenced Mr. Maraio to one year and one day of imprisonment. Notably, defense counsel in *Maraio* similarly argued that the court should sentence the defendant to probation based on *Carson* and take into account his service to the community, his work at Ground Zero in the weeks following the 9/11 attacks, and the need for the defendant to take care of family members with medical issues. As with *Carson*, the instant case is distinguishable from *Maraio* for the same reasons, and the Government respectfully submits that the aggravating factors present in this case discussed above warrant a Guidelines sentence of imprisonment.

## IV. CONCLUSION

For the foregoing reasons, the Government respectfully requests that the Court impose a sentence of imprisonment within the applicable Guidelines range of 30 to 37 months' imprisonment, as such a sentence would be fair and appropriate, and would be sufficient but not greater than necessary to serve the legitimate purposes of sentencing.

Dated: New York, New York
August 6, 2019

Respectfully submitted,

GEOFFREY S. BERMAN
United States Attorney
Southern District of New York

By: ______________________________
Sagar K. Ravi
Assistant United States Attorney
(212) 637-2195

# EXHIBIT A




SOCIAL SECURITY

July 22, 2019

Hon. Alison J. Nathan
United States District Judge
Thurgood Marshall
United States Courthouse
40 Foley Square
New York, NY 10007

**Re: United States v. Gerard Scparta, Crim. No. 18-578**

Judge Nathan:

I am writing on behalf of the Social Security Administration (SSA or Agency) regarding the sentencing of defendant, Gerard Scparta, to explain how his crimes affected the Agency and the people who rely on critical benefit payments.

SSA pays benefits to nearly 64 million Americans monthly. The programs we administer are a tie that binds all of us, representing some of our country's deepest held values. Unlike other crimes, stealing from SSA is a crime against everyone. Indeed, such a crime is a violation of a basic trust between all of us, who, as citizens of our great republic, are responsible to one another for the stewardship and preservation of our country's economic and social wellbeing.

The fraud in this case is more insidious than a simple crime against property. From 1997-2017, Mr. Scparta knowingly and willfully embezzled and stole money from the SSA and all American taxpayers. Specifically, Mr. Scparta claimed that he was unable to work due to his disabling conditions. As a result of his misrepresentation, Mr. Scparta was approved for Social Security Disability Insurance (DI) benefits. However, Mr. Scparta plead guilty to theft of government property because he received DI benefit payments to which he knew he was not entitled. Defendant's willful, repeated, fraudulent actions resulted in a loss to the Social Security DI Trust Fund of over $638,000[1]. Criminal activity, like those of Mr. Scparta, is an affront to the 8.5 million disabled workers—and their 1.6 million dependents—who rely on DI benefits to survive.

Additionally, SSA and its Office of the Inspector General spent administrative time and resources to investigate Mr. Scparta's crime. Furthermore, fraudulent, criminal conduct like defendant's

[1] This amount does not directly affect the Social Security Administration's administrative policies or proceedings, calculation or collection of overpaid benefits, or their consideration of administrative or civil monetary penalties.

adversely affects the confidence of Congress and the American people in the programs we administer.

Thank you for allowing me the opportunity to address the Court. A crime against SSA is not victimless, but rather a crime against all of us. It is my hope that your sentence of the defendant reflects the seriousness of his offense and the very high monetary value of his crimes.

Sincerely,

Jeffrey Buckner
Acting Assistant Regional Commissioner
Management and Operations Support