USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 4/19/20

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

United States

—v—

Gerard Scparta,

Defendant.

18-cr-578 (AJN)

OPINION & ORDER

ALISON J. NATHAN, District Judge:

Defendant Gerard Scparta is currently incarcerated at FCI Butner in North Carolina, which is the site of one of the worst outbreaks of COVID-19 in any federal prison. He suffers from a number of serious medical issues that put him at high risk of severe medical consequences were he to contract the virus. As a result, he has filed an administrative request with the Bureau of Prisons and an emergency motion for compassionate release, pursuant to 18 U.S.C. § 3582(c), with this Court. While this motion was pending, the BOP decided that Mr. Scparta should be released from custody to serve the remainder of his term in home confinement.

One might conclude that this admirable decision would resolve the issue and moot the compassionate-release motion. Unfortunately it does not. That is because the BOP has determined that Mr. Scparta must remain in custody during the peak of the pandemic for what it labels a "14-day quarantine"—but his current confinement is neither a quarantine nor limited to 14 days. In fact, following inquiries from this Court, the Government revealed that Mr. Scparta is housed with many other people in conditions that will inevitably permit the virus to spread. Moreover, as of April 14, the BOP determined that Mr. Scparta's 14-day-clock must *start over* because one of the many people he is now housed with tested positive. Under the BOP's policy, if any one of the individuals in Mr. Scparta's unit, most of whom have *also* been approved for

1

home confinement, tests positive, the 14-day waiting period for *all* inmates in the unit starts anew.  The Government also revealed that, despite express authority from the Attorney General to do so, the BOP has not and will not consider permitting Mr. Scparta to self-quarantine in his residence for 14 days.

Given this dangerous set of conditions and Kafkaesque approach, Mr. Scparta presses the Court to grant his still pending motion for compassionate release and order him immediately released on conditions that include a 14-day period of self-isolation in his home.  Without any hesitation, the Court concludes that Mr. Scparta is entitled to compassionate release.  The barrier to the Court acting immediately, however, is that Mr. Scparta has not exhausted his administrative remedies.  In a previous case, the Court determined that it lacked power to waive compliance with the compassionate-release provision's exhaustion requirement.  *See United States v. Gross*, No. 15-cr-769 (AJN), 2020 WL 1862251 (S.D.N.Y. Apr. 14, 2020).  Since reaching that conclusion, however, another Court in this District issued a decision that reached a contrary conclusion.  *See United States v. Russo*, No. 16-cr-441 (LJL), 2020 WL 1862294 (S.D.N.Y. Apr. 14, 2020).  This Court is persuaded by Judge Liman's decision.  As Justice Frankfurter warned: "Wisdom too often never comes, and so one ought not to reject it merely because it comes late."  *Henslee v. Union Planters Nat. Bank & Tr. Co.*, 335 U.S. 595, 600 (1949) (Frankfurter, J., dissenting).  Accordingly, for the reasons that follow, Mr. Scparta's request is GRANTED, and the Government is ordered to release Mr. Scparta from custody immediately.

## I.  BACKGROUND

In April 2019, Mr. Scparta was charged in a four-count superseding information.  Dkt. No. 30.  The Government accused Mr. Scparta of submitting fraudulent social security disability

claims for about two decades.  *Id.*; *see also* Dkt. Nos. 35, 45.  That same month, Mr. Scparta pled

guilty to one count of theft of government funds, in violation of 18 U.S.C. § 641, and one count

of tax evasion, in violation of 26 U.S.C. § 7201.  *See* Dkt. No. 35.  In August 2019, the Court

sentenced Mr. Scparta to 18 months' imprisonment, to be followed by three years' of supervised

release.  Dkt. Nos. 46 (judgment); 48 at 25–26 (sentencing transcript).

Mr. Scparta is currently serving his sentence in FCI Butner in North Carolina.  His

expected release date, reflecting good-time credit, is December 28, 2020.  Mr. Scparta therefore

has served a little more than half of his sentence.  On April 8, 2020, he filed an emergency

motion for compassionate release.  Dkt. No. 51.  Two days earlier, Mr. Scparta had submitted the

same request to the warden of his prison.  Dkt. No. 51, Ex. B.  Mr. Scparta seeks compassionate

release because his underlying health conditions make him highly vulnerable to COVID-19.

Mr. Scparta is 55-years old and suffers from high blood pressure, high cholesterol, sleep apnea,

and hypertension, and he therefore contends that he is susceptible to serious injury or death if he

contracts the disease.  In support of his motion, he submitted a letter from his primary-care

doctor, who stated: "Given recent conditions with [the] COVID-19 pandemic and due to his

hypertension and other medical issues, [Mr. Scparta] is at high risk for COVID."  Dkt. No. 51,

Ex. C.  Mr. Scparta also relied upon statistics regarding the spread of COVID-19 at FCI Butner,

which have become even more shocking since his filing.  As of April 19, 2020, FCI Butner has

had 65 inmates and 25 staff members positive for COVID-19, and five inmates have died.  *See*

Bureau of Prisons, Coronavirus, https://www.bop.gov/coronavirus/.  Testing in BOP facilities is

severely limited however, and the real numbers are likely far higher.

The Government opposed Mr. Scparta's request.  Dkt. Nos. 52, 53.  In its submission the

Government argued that the Court is powerless to grant Mr. Scparta's proposed relief because he

has not exhausted administrative remedies.  Dkt. No. 52.  The Government further argued that, even if Mr. Scparta had exhausted, he is not entitled to release.  Dkt. No. 53.

Nevertheless, on April 14, 2020, the Government informed the Court that the Bureau of Prisons has determined that Mr. Scparta is eligible for home confinement pursuant to 18 U.S.C. § 3624(c).  Dkt. No. 55.  The BOP scheduled Mr. Scparta for transfer to home confinement on April 30, 2020, after what the Government represents to be a "14-day quarantine period" at FCI Butner.  *Id.*  The Government represented that FCI Butner is "quarantining" all inmates who will be released on home confinement for 14 days before their release, pursuant to "current directives of the Attorney General."  Dkt. No. 63 at 2.  Mr. Scparta, however, contends that this purported "quarantine" is no quarantine at all.  Mr. Scparta remains in regular and close contact with other inmates and prison staff at FCI Butner.  He lines up with other inmates in close proximity in order to receive food and medication multiple times per day.  He also shares communal spaces like toilets, sinks, and showers with dozens of other people.  Indeed, Mr. Scparta is not housed in a cell by himself; he shares his cell with another prisoner.  *See* Dkt. No. 62 (describing the conditions of Mr. Scparta's confinement).  The Government does not contest any of these facts. *See* Dkt. No. 63.  Mr. Scparta therefore asks to quarantine in his home in Orange County, New York, where it is undisputed that he can safely distance from members of his family and the public and receive medical care if necessary.  *See* Dkt. No. 62.

On April 17, 2020, the Court noted that the guidance from the Attorney General, which the Bureau of Prisons uses to justify its quarantine requirement, also provides the BOP with discretion to *immediately* release inmates who have been approved for home confinement, so that they may quarantine at home instead of the facility at which they are incarcerated.  *See* William P. Barr, Attorney General, Memorandum for Director of Bureau of Prisons: Increasing Use of

Home Confinement at Institutions Most Affected by COVID-19, at 2 (Apr. 3, 2020).  The Court therefore asked the Government how often the Bureau of Prisons has exercised this discretion for inmates approved for home confinement at FCI Butner, and whether the BOP considered exercising this discretion to immediately transfer Mr. Scparta to his home.

On April 18, 2020, the Government filed a reply.  Dkt. No. 65.  The Government represented that to date, FCI Butner "has not been exercising case-by-discretion as to whether inmates should be released to a 14-day quarantine prior to release." *Id.* at 1.  Instead, "the BOP instructed FCI Butner staff to place all inmates being released to home confinement into quarantine 14 days prior to their scheduled transfer date." *Id.*  Mr. Scparta was placed in what the Government labels "quarantine" on April 10, "along with other inmates with upcoming home confinement dates," such that they could be released on April 24.  However, and entirely unsurprisingly, on April 14, "one of the inmates in the defendant's unit become symptomatic and has since tested positive for COVID-19." *Id.* at 1–2.  Under the BOP's policy, this caused the 14-day quarantine period "for each inmate in the unit, including Scparta, [to] re-start[], and the quarantine will now be completed on April 28, 2020, assuming no other inmates in the defendant's unit becomes symptomatic." *Id.* at 2.

The Court notes the plain absurdity of the Government's and the Bureau of Prisons' position.  Under this policy—which, as far as the Court is aware, is not mandated by any statute, regulation, or informal guidance issued by the Attorney General—many inmates who are on the cusp of relief to home confinement to protect them from COVID-19, which is spreading rampantly at FCI Butner, are housed together in close quarters for at least 14 days.  No testing for COVID-19 is done before placement in this group quarantine.  If *any* inmate in the unit tests positive, the 14-day clock for *every* individual being quarantined starts anew. *See id.*  If

somehow 14 days go by for an inmate with no other inmate showing symptoms of COVID-19, the inmate will be released without testing.  The senselessness of this policy is laid bare by two undisputed scientific facts: (1) individuals who are asymptomatic are capable of spreading COVID-19, and (2) individuals infected with COVID-19 may not show any symptoms for days. *See* Centers for Disease Control and Prevention, Coronavirus Disease 2019, https://www.cdc.gov/coronavirus/2019-ncov/hcp/faq.html.  As the Court noted, FCI Butner has had about seventy confirmed cases of COVID-19, and because testing is severely limited, the actual numbers are certainly far higher.  In these circumstances, community spread through individuals not showing symptoms is inevitable, including in units of inmates who have been approved for home confinement.  The BOP's policy therefore makes it likely that inmates approved for home confinement will not be released; as the virus spreads in the unit, the 14-day clock will repeatedly restart, perpetually prolonging incarceration.  If they are released, they may well be positive and asymptomatic, thus endangering the broader community.

The Court speaks in stark terms: this is an illogical and self-defeating policy that appears to be inconsistent with the directive of the Attorney General, ungrounded in science, and a danger to both Mr. Scparta and the public health of the community.

## II.    DISCUSSION

"Federal courts are forbidden, as a general matter, to 'modify a term of imprisonment once it has been imposed,' 18 U.S.C. § 3582(c); but the rule of finality is subject to a few narrow exceptions."  *Freeman v. United States*, 564 U.S. 522, 526 (2011).  The compassionate-release statute creates one such exception: It allows a court to "reduce" a term of imprisonment, after considering the factors set forth in 18 U.S.C. § 3553(a), if "it finds that . . . extraordinary and compelling reasons warrant such a reduction . . . and that such a reduction is consistent with

applicable policy statements issued by the Sentencing Commission."  18 U.S.C.

§ 3582(c)(1)(A)(i).  Under the recently enacted First Step Act, defendants serving their sentence

may move the Court for compassionate release.  *Gotti*, 2020 WL 497897, at *2; *United States v.*

*Gross*, No. 15-CR-769 (AJN), 2020 WL 1673244, at *2 (S.D.N.Y. Apr. 6, 2020).  Mr. Scparta

has filed such a motion.

### A.  The Court Excuses Mr. Scparta's Failure to Exhaust

Before a compassionate-release motion can be considered on the merits, the defendant

must exhaust administrative remedies.  The First Step Act provides that courts can consider

compassionate-release motions brought by incarcerated defendants only if one of two

requirements is met.  First, courts can consider such motions "after the defendant has fully

exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion

on the defendant's behalf."  18 U.S.C. § 3582(c)(1)(A).  Second, courts can consider such

motions after "the lapse of 30 days from the receipt of such a request by the warden of the

defendant's facility."  *Id.*  The earlier of these two dates controls; as soon as one of these

requirements is met, the exhaustion requirement is satisfied.  *Id.*

Here, the parties agree that neither requirement is met—and the Defendant therefore has

not exhausted his administrative remedies.  Mr. Scparta initiated the Bureau of Prisons'

administrative process two days before filing his motion in this Court.  On April 6, 2020, he

requested that the warden of his facility file a compassionate-release motion on his behalf.  This

is the first step in the BOP's administrative process.  *See generally* 28 C.F.R. § 571.63 (outlining

this procedure).  The warden has yet to rule on Mr. Scparta's request, and the United States

Attorney's Office for the Southern District of New York refuses to exercise its discretion to

waive exhaustion.  *See* Dkt. No. 53.

Mr. Scparta however argues that the Court should overlook his failure to exhaust administrative remedies.  To start, he contends that the First Step Act's exhaustion requirement is not jurisdictional, and therefore can be excused.  And he argues that because COVID-19 poses immediate danger to his health, proceeding through the BOP's internal administrative process would both be futile and cause him irreparable harm.  *See* Dkt. No. 51 at 14–15.

This Court very recently examined and opined on these issues.  *See United States v. Gross*, No. 15-cr-769 (AJN), 2020 WL 1862251 (S.D.N.Y. Apr. 14, 2020).  As the Court explained in *Gross*, Mr. Scparta is correct that the First Step Act's exhaustion requirement is not jurisdictional.  *Id.* at \*\*4; *see also Sebelius v. Auburn Reg'l Med. Ctr.*, 568 U.S. 145, 153 (2013) (holding that unless Congress "clearly stated that [a] rule is jurisdictional," the Court must treat it as non-jurisdictional (internal quotation marks omitted)).  The exhaustion requirement in Section 3582(c) is instead a claim-processing rule, which is a non-jurisdictional rule that "seek[s] to promote the orderly progress of litigation by requiring that the parties take certain procedural steps at certain specified times."  *Henderson v. Shinseki*, 562 U.S. 428, 435 (2011).  Thus, "the exhaustion requirement in Section 3582(c)(1)(A) merely controls who—the BOP or defendant— may move for compassionate release and when such a motion may be made.  It simply delineates the process for a party to obtain judicial review, not referring the adjudicatory capacity of the courts."  *United States v. Haney*, No. 19-cr-541 (JSR), 2020 WL 1821988, at \*2 (S.D.N.Y. Apr. 13, 2020) (also noting that this exhaustion requirement is "not part of a jurisdictional portion of the criminal code" (internal quotation marks and citation omitted)).

Mr. Scparta is also correct that some Courts have excused failure to comply with the exhaustion requirement in this context for equitable reasons like futility.  *See, e.g., United States v. Perez*, No. 17-cr-513-3 (AT), 2020 WL 1546422, (S.D.N.Y. Apr. 1, 2020); *Haney*, 2020 WL

1821988, at *2.  But in *Gross*, after reading the available authority on the subject and acting expeditiously as the circumstances required, this Court rejected that approach, and concluded that the First Step Act's exhaustion requirement could not be excused.  *Gross*, 2020 WL 1862251, at *2.

Since this Court issued its decision on exhaustion in *Gross*, Judge Lewis Liman published a persuasive opinion on the same subject.  *See United States v. Russo*, No. 16-cr-441 (LJL), 2020 WL 1862294 (S.D.N.Y. Apr. 14, 2020).  In that case, the defendant similarly suffered from "serious medical ailments that put him at high-risk for contracting COVID-19 and for very serious medical consequences should he contract it," and he therefore sought compassionate release.  *Id.* at *1.  And just as here, the defendant did not exhaust his administrative remedies. *See id.* at *3.  Judge Liman noted that the Supreme Court and Second Circuit have applied equitable exceptions to mandatory claims-processing rules like this one, and concluded that the text, history, and purpose of the First Step Act counsel in favor of finding the requirement amenable to such exceptions.  *Id.*

This Court is persuaded by Judge Liman's well-reasoned decision.  To begin, even the Government concedes that this statutory requirement is subject to one equitable exception: waiver.  That is, the Government is of the view that it can waive exhaustion, but not the Court. Indeed, the Government has waived compliance with the exhaustion requirement in compassionate-release motions in this very District.  *See, e.g.*, *United States v. Knox*, No. 15-cr-445-12 (PAE).  And the Supreme Court has "reserved [decision on the question] whether mandatory claim-processing rules may be subject to equitable exceptions" other than waiver and forfeiture.  *Hamer v. Neighborhood Hous. Servs. of Chicago*, 138 S. Ct. 13, 18 n.3 (2017).  The Supreme Court has also held that mandatory statutory rules, analogous to the one here, can be

subject to certain equitable exceptions.  For example, in *Holland v. Florida*, the Supreme Court

noted that "a nonjurisdictional federal statute of limitations is normally subject to a 'rebuttable

presumption' in *favor* 'of equitable tolling.'"  560 U.S. at 645–46 (2010) (emphasis in original)

(quoting *Irwin v. Department of Veterans Affairs*, 498 U.S. 89, 95–96 (1990)); *see also Young v.*

*United States*, 535 U.S. 43, 49 (2002) ("It is hornbook law that limitations periods are

'customarily subject to "equitable tolling"'" (quoting *Irwin*, 498 U.S. at 95)).

  The insight of Judge Liman's recent decision is that the Second Circuit has provided

more clear guidance, stating that "claim-processing rule[s]" are "subject to equitable

considerations such as waiver, estoppel or futility."  *Paese v. Hartford Life & Acc. Ins. Co*., 449

F.3d 435, 443 (2d Cir. 2006).  In particular, the Second Circuit has applied this principle to

statutes of limitation and deadlines contained in the Federal Rules, holding that exceptions exist

to facially unequivocal time cutoffs.  *See, e.g.*, *Weitzner v. Cynosure, Inc*., 802 F.3d 307, 311 (2d

Cir. 2015), as corrected (Oct. 27, 2015) (determining that the "28-day time limit of FRAP Rule

4(a)(4)(A)(vi) . . . should be considered a 'claim-processing rule,' which *is* subject to equitable

exception or waiver"); *Grewal v. Cuneo Gilbert & LaDuca LLP*, 2020 WL 897410 (2d Cir. Feb.

25, 2020) ("We have held that Rule 4(a)'s 28-day deadline is not jurisdictional, but is a 'claim-

processing rule' and, as such, its enforcement is subject to waiver, forfeiture, and other equitable

exceptions."); *see also Fed. Ins. Co. v. United States*, 882 F.3d 348, 361 (2d Cir. 2018) ("Claim-

processing rules, much like statutes of limitations, . . . may be subject to equitable tolling

doctrines.").  These cases, which the Court did not consider in its prior decision, counsel in favor

of holding the First Step Act's exhaustion requirement amenable to judicial exception.

  To be sure, the claims processing rule here is not a statute of limitation—but instead an

exhaustion requirement.  *See* 18 U.S.C. § 3582(c)(1)(A).  And in a series of cases, the Supreme

Court has expressed reservations about reading equitable exceptions into statutory exhaustion requirements.  For example, in *Ross v. Blake*, the Supreme Court considered the Prison Litigation Reform Act's exhaustion requirement for suits challenging prison conditions, and reversed a lower-court decision that had created an "extra-textual exception" to the requirement.  136 S.Ct. 1850, 1854–56 (2016) (citing 42 U.S.C. § 1997e(a)).  The Court explained that while "judge-made exhaustion doctrines . . . remain amenable to judge-made exceptions . . . a statutory exhaustion provision stands on a different footing," and "courts have a role in creating exceptions only if Congress wants them to."  *Id.* at 1856–57.  The Supreme Court thus analyzed the PLRA's text and legislative history and concluded that its exhaustion requirement foreclosed judicial exceptions.

Here, the Court must determine whether Congress evinced an intent for the First Step Act's exhaustion requirement to admit exceptions.  *See McCarthy v. Madigan*, 503 U.S. 140, 144 (1992) (noting that congressional intent is "paramount" in determining whether a particular statute's exhaustion regime is amenable to exception); *Russo*, 2020 WL 1862294, at *6 (framing this inquiry as one centered on congressional intent).  As the Court discussed above, Section 3582 provides that a defendant can exhaust either by completing the agency's internal process or if the agency fails to act for 30 days.  Judge Rakoff succinctly explained this provision in *Haney*: "[T]he statute does not necessarily require the moving defendant to fully litigate his claim before the agency (i.e., the BOP) before bringing his petition to court.  Rather, it requires the defendant either to exhaust administrative remedies or simply to wait 30 days after serving his petition on the warden of his facility before filing a motion in court."  *Haney*, 2020 WL 1821988, at *3

Put simply, this an exhaustion requirement like no other of which the Court is aware. *Accord id.* ("§ 3582(c)(1)(A) does not contain an exhaustion requirement in the traditional

sense."); *Russo*, 2020 WL 1862294, at \*6 (noting that this provision is "distinctive").  And as the Supreme Court has repeatedly stressed, courts analyzing statutes must pay attention not just to the particular word, phrase, or provision at issue in the case, but instead how Congress legislates across the entire *corpus juris*, such that like provisions are treated *in pari materia* and dissimilar provisions are treated differently.  *See generally United States v. Ressam,* 553 U.S. 272, 277 (2008); *Powerex Corp. v. Reliant Energy Servs., Inc.*, 551 U.S. 224, 229 (2007).  In interpreting the First Step Act's exhaustion provision, therefore, the Court must be mindful of how it differs from dozens of others that fill the United States Code.  Congress deliberately crafted an exhaustion requirement that, on its face, "is extremely unusual . . . if not unprecedented."  *Russo*, 2020 WL 1862294, at \*6.

Crucially, Section 3582(c) certainly has "features of an administrative exhaustion requirement," but it is also structured differently from other exhaustion regimes, in that it is also contains features of "a timeliness statute."  *Id.*  As to the statute's traditional exhaustion requirement, the Supreme Court's decision in *Ross* dictates that equitable exceptions will rarely, if ever, apply.  As to the timeliness requirement, however, the Supreme Court and Second Circuit have often applied equitable exceptions to otherwise unforgiving time requirements, strongly supporting the conclusion that they apply here too.  *See Holland*, 560 U.S. at 649 (applying equitable exception even though text did not permit such an exception); *Paese*, 449 F.3d at 443.  Indeed, it would frustrate Congress's intent, and render Congress's deliberate choice to craft this exception differently, if the Court ignored the second half of Section 3582(c) and treated this like the traditional exhaustion scheme that the Supreme Court considered in *Ross*.

In addition, the Supreme Court has also long looked to the titles of statutory provisions to determine congressional intent.  See *Yates v. United States*, 574 U.S. 528, 540 (2015);

*Almendarez–Torres v. United States*, 523 U.S. 224, 234 (1998) ("[T]he title of a statute and the heading of a section are tools available for the resolution of a doubt about the meaning of a statute." (internal quotation marks omitted)).  The title of the First Step Act's provision that enacted this exhaustion regime is "Increasing the Use and Transparency of Compassionate Release."  Pub. L. No. 115-391, 132 Stat. 5339 (2018).  In this case, construing the exhaustion requirement strictly would serve neither of these aims.  Without the application of equitable exceptions, prisoners bringing compassionate-release motions due to COVID-19 may *never* obtain timely judicial review before the virus takes its toll.  The BOP's internal administrative process is lengthy.  First, an inmate must request the warden of her facility to file a compassionate-release motion on her behalf.  28 C.F.R. § 571.61(a).  Second, if the warden denies the prisoner's request, she has 20 days to appeal to the BOP's Regional Director.  *Id.* § 571.63(a) (providing that denials of compassionate-release requests are governed by the BOP's general Administrative Remedy Program, contained in 28 C.F.R. §§ 542.10 - 542.19); *id.* § 542.15(a) ("An inmate who is not satisfied with the Warden's response may submit an Appeal on the appropriate form (BP-10) to the appropriate Regional Director within 20 calendar days of the date the Warden signed the response.").  Third, if the Regional Director denies the prisoner's request, she then has 30 days to appeal to the BOP General Counsel.  *Id.* § 542.15(a).  A decision from the General Counsel is the final step in the BOP's Administrative Remedy Program, *id.*, and therefore "constitutes a final administrative decision," *id.* § 571.63(b).  This administrative exhaustion regime could take *weeks*, if not *months*.  True enough, the statute's 30-day lapse provision provides a judicial backstop—but even thirty days may be far too long for individuals at high risk for COVID-19.  The statute's plain text—both its distinctive structure and its title— therefore supports application of equitable exceptions.

The Court's analysis, however, does not end with the statute's text and structure.  The Supreme Court in *Ross* considered the PLRA's legislative history at length to determine whether "its exhaustion regime" was of a "mandatory nature."  136 S.Ct. at 1857.  The PLRA's exhaustion regime was specifically designed to cure the "weak[er]" and discretionary exhaustion requirement of an earlier prison-litigation statute.  The Supreme Court relied on this history to conclude that the PLRA's requirement was not subject to equitable exception.  *Id.*

The Court thus likewise considers the First Step Act's legislative history.  *See also McCarthy*, 503 U.S. at 144 (congressional intent is "paramount" in this inquiry).  To begin, the House Report for the First Step Act explains that the statute is designed to "enhance public safety" and "make[] . . . changes to Bureau of Prisons' policies and procedures to ensure prisoner and guard safety and security."  H.R. Rep. 115-699 at 22.  Yet strictly construing the exhaustion requirement and not admitting equitable exceptions in these circumstances achieves precisely the opposite result.  The risk to incarcerated individuals like Mr. Scparta is acute; as this Court has explained, individuals in carceral settings are at particularly high risk for contracting the disease because of the inability to individuals to socially distance, shared communal spaces, and limited access to hygiene products.  *See Coronel v. Decker*, No. 20-CV-2472 (AJN), 2020 WL 1487274, at *3 (S.D.N.Y. Mar. 27, 2020).  This risk, however, is not just to prisoners—it extends to prison guards and staff.  As of April 18, 2020, the Bureau of Prisons reports that about 500 inmates and 300 BOP staff have contracted COVID-19.  *See* COVID-19, Federal Bureau of Prisons, https://www.bop.gov/coronavirus/.  And the public is also at risk.  Inmates who are released from prison and prison staff become additional vectors of transmission, increasing COVID-19's community spread.  In short, a strict application of the statute's exhaustion requirement would foreclose judicial review for inmates like Mr. Scparta, therefore posing risk to prisoners, guards,

and the public—the opposite of the First Step Act's legislative purpose.  Unlike the PLRA, Congress specifically designed the First Step Act to result in expeditious review of prisoner applications and to improve the health and safety of inmates, prison staff, and the community. Yet Mr. Scparta is currently stuck in the bizarre limbo of the Bureau of Prisons' quarantine policy, which, as the Court has discussed, achieves the backward result of prolonging incarceration and increasing community spread, all of which runs directly counter to Congress's express purpose.

Moreover, as Judge Liman has explained, the First Step Act's exhaustion requirement reflects a careful balance between "competing [congressional] objectives."  *United States v. Russo*, No. 16-cr-441 (LJL), Dkt. No. 54, at 4 (S.D.N.Y. Apr. 3, 2020).  He outlined these objectives as follows: "First, the language recognizes that the BOP is frequently in the best position to assess, at least in the first instance, a defendant's conditions, the risk presented to the public by his release, and the adequacy of a release plan . . . At the same time, permitting a defendant to seek judicial relief within 30 days of making a request to the facility's warden unquestionably reflects congressional intent for the defendant to have the right to a meaningful and prompt judicial determination of whether he should be released."  *Id.* at 4–5.  Because "the 30-day rule was meant as an accelerant to judicial review . . . it would pervert congressional intent to treat it as a substantial obstacle to effective judicial review."  *Id.* at 5.

In sum, the First Step Act's text, history, and structure all counsel in favor of concluding that the statute's exhaustion requirement is amenable to equitable exceptions.  And here, waiting for Mr. Scparta to exhaust his remedies would both be futile and cause him irreparable harm.  As discussed above, FCI Butner, the complex at which Mr. Scparta is currently held, is a national leader in documented cases of COVID-19.  *See* Mitchell McCluskey, Chris Boyette, and

Susannah Cullinane, "A North Carolina prison complex has 60 inmates and 23 staff members with coronavirus," CNN (Apr. 12, 2020), *available at* https://www.cnn.com/2020/04/12/us/butner-prison-coronavirus-cases/index.html; *see also* Dkt. No. 51 (citing additional statistics); Bureau of Prisons, Coronavirus, https://www.bop.gov/coronavirus/.  For Mr. Scparta to wait an additional two weeks (until 30 days lapse under the First Step Act's exhaustion requirement) could be the difference between life and death—and if he falls seriously ill or dies, he would have suffered irreparable harm and his motion seeking release would be futile.  *Accord Perez*, 2020 WL 1546422, at *3 ("Here, even a few weeks' delay carries the risk of catastrophic health consequences for Perez.  The Court concludes that requiring him to exhaust administrative remedies, given his unique circumstances and the exigency of a rapidly advancing pandemic, would result in undue prejudice and render exhaustion of the full BOP administrative process both futile and inadequate.").  Indeed, the Government has taken the position in this District that the BOP's grant of home confinement likely moots an inmate's motion for compassionate release, so the agency itself may no longer even be considering Mr. Scparta's motion.  *See United States v. Skelos*, No. 15-cr-317 (KMW), Dkt. No. 512, at 2.  For these reasons, the Court excuses Mr. Scparta's failure to exhaust administrative remedies.

### B.  The Defendant Has Satisfied All Other Requirements For Compassionate Release

Given that administrative exhaustion does not bar Mr. Scparta's request, the Court now considers the merits of his motion.  To award Mr. Scparta the relief he seeks, the Court must find that "extraordinary and compelling reasons warrant" compassionate release. 18 U.S.C. § 3582(c)(1)(A)(i).  The Court must also consider the factors set forth in 18 U.S.C. § 3553(a). *Id.* § 3582(c)(1)(A).  And the Court must find that release is consistent with the Sentencing

Commission's policy statements.  *Id.* § 3582(c)(1)(A)(i).

The Court begins with the factors set out in 18 U.S.C. § 3553(a).  Because this Court sentenced Mr. Scparta, the Court is intimately familiar with how these factors apply to his circumstances.  As the Court noted at Mr. Scparta's sentencing, the underlying crimes at issue here are undoubtedly serious.  Dkt. No. 48 at 21.  However, Mr. Scparta pled guilty and has accepted responsibility for his conduct, both in person before the Court and in his written submissions.  *Id.* at 23.  He is a first-time offender, and his offenses were nonviolent.  *Id.*  In addition, under the § 3553(a) analysis, "[h]ow Mr. Scparta lived his life in other regards also matters."  *Id.*  For more than ten years, Mr. Scparta served the public through his service in the New York Police Department.  *Id.*  By all accounts, his work as a police officer was exemplary. *Id.* at 24; *see also* Dkt. No. 44 at 5–7 (Mr. Scparta's sentencing submission).  In addition, on September 11, 2001, despite having left the NYPD by that time, Mr. Scparta rushed towards the World Trade Center.  In the weeks that followed, he volunteered in the rescue,  recovery, and cleanup efforts at Ground Zero—at great personal cost.  Dkt. No. 44 at 13–14.  While the Court's 18-month sentence reflected the seriousness of Mr. Scparta's offense and was at the time sufficient, but no greater than, necessary to achieve the purposes of sentencing, the Court's analysis is different in present circumstances.  Specifically, due to the COVID-19 pandemic, the "history and characteristics of the defendant" and the "need . . . to provide the defendant with needed . . . medical care," § 3553(a), now weigh heavily in favor of Mr. Scparta's release, given the health risk that continued incarceration poses to him.  In short, the Court has reconsidered the § 3553(a) factors, and concludes that they entitle Mr. Scparta to compassionate release.

The Court next considers whether "extraordinary and compelling reasons warrant such a reduction [in sentence] . . . and that such a reduction is consistent with applicable policy

statements issued by the Sentencing Commission."  18 U.S.C. § 3582(c)(1)(A).  "Congress

tasked the Sentencing Commission with identifying the circumstances that are sufficiently

extraordinary and compelling to justify a reduction in sentence."  *United States v. Butler*, No. 19-

cr-834 (PAE), 2020 WL 1689778, at *1 (S.D.N.Y. Apr. 7, 2020).  The applicable policy

statement, U.S.S.G. § 1B1.13, outlines four circumstances that constitute "extraordinary and

compelling reasons" and thus warrant a sentence reduction.  One of these circumstance exists

where the defendant is "suffering from a serious physical or medical condition . . . that

substantially diminishes the ability of the defendant to provide self-care within the environment

of a correctional facility and from which he or she is not expected to recover."  U.S.S.G.

§ 1B1.13(1)(A) & cmt. n.1(A).  The policy statement also requires that the defendant not pose "a

danger to the safety of any other person or to the community."  U.S.S.G. § 1B1.13(2).

As this Court has explained, the COVID-19 pandemic presents an extraordinary and

unprecedented threat to incarcerated individuals.  *See, e.g.*, *United States v. Stephens*, 2020 WL

1295155; *Gross*, 2020 WL 1673244 ("we are not currently living under normal circumstances");

*accord United States v. Nkanga*, No. 18-CR-713 (JMF), 2020 WL 1529535, at *1 (S.D.N.Y.

Mar. 31, 2020) ("The country faces unprecedented challenges from the novel Coronavirus

pandemic. Those detained in jails and prisons face particularly grave danger.").  In these exigent

circumstances, the 30-day exhaustion period may be far too long—"each day, perhaps each hour,

that elapses 'threatens incarcerated defendants with greater peril.'"  *Gross*, 2020 WL 1673244, at

*3 (quoting *United States v. Russo*, No. 16-cr-441 (LJL), Dkt. No. 54 at 5 (S.D.N.Y. Apr. 3,

2020)).  Moreover, Mr. Scparta suffers from multiple medical issues that make him especially

vulnerable to complications from COVID-19.  Specifically, Mr. Scparta suffers from

hypertension, sleep apnea, high blood pressure, and high cholesterol.  The Centers for Disease

Control has identified hypertension as a comorbidity that increases the likelihood of serious risk

from COVID-19.  *See* Interim Clinical Guidance for Management of Patients with Confirmed

Coronavirus Disease, Centers for Disease Control and Prevention, *available at*

https://www.cdc.gov/coronavirus/2019-ncov/hcp/clinical-guidance-management-patients.html

(last updated April 13, 2020); s*ee also Basank v. Decker*, No. 20-cv-2518 (AT), 2020 WL

1481503, at *3 (S.D.N.Y. Mar. 26, 2020) (noting that hypertension increases risk of harm from

COVID-19, taking "judicial notice that, for people of advanced age, with underlying health

problems, or both, COVID-19 causes severe medical conditions and has increased lethality," and

citing information from the CDC).  Moreover, the Court rejects the Government's contention

that Mr. Scparta general good health before the pandemic speaks to whether he should now be

released.  To start, the Government's own exhibit, which contains Mr. Scparta's medical history

while in BOP custody, is inconsistent about the state of his health, noting that although Mr.

Scparta "appears to be in generally good health," his hypertension and blood pressure are "not

controlled."  Dkt. No. 53, Ex. A.  Even putting this aside, Mr. Scparta's purported good health

months ago does not immunize him now from serious risk—and even death—from contracting

COVID-19.  In addition, given the non-violent nature of the offenses at issue and Mr. Scparta's

years of public service as a police officer, the Court has little reason to think Mr. Scparta poses

any risk to the public.  These factors taken together are extraordinary and compelling, and are

therefore sufficient to warrant compassionate release.  *See, e.g.*, *United States v. Sawics*, No. 08-

CR-287 (ARR), 2020 WL 1815851, at *2 (E.D.N.Y. Apr. 10, 2020) (concluding that, because

the defendant suffered from hypertension, he was vulnerable to COVID-19 and thus "the risk of

serious illness or death that he faces in prison constitutes an extraordinary and compelling reason

militating in favor of his release.").

Although the Bureau of Prisons has determined that Mr. Scparta is eligible for home confinement, the Court is not confident that he will ever actually obtain that relief, due to the BOP's so-called quarantine policy.  Moreover, despite the Government's position, these forms of relief come from different statutory provisions and bring with them different consequences, so the grant of one does not moot the Court's authority over the other.  *Compare* 18 U.S.C. § 3582(c)(1)(A) *with id.* § 3624(c).  In sum, the Court concludes that Mr. Scparta has satisfied all requirements for compassionate release.

## III.   CONCLUSION

For the reasons stated above, the Court GRANTS Mr. Scparta's motion for compassionate release.  The Court therefore RESENTENCES Mr. Scparta to time served plus 36 months of supervised release under the conditions in the original judgment.  The mandatory conditions, standard conditions, and special conditions of supervised release from Mr. Scparta's original sentence are hereby imposed.

The Government is ORDERED to release Mr. Scparta from custody immediately.  To be clear, the Court will not abide delaying Mr. Scparta's release for any period of time in the name of a so-called quarantine that only furthers the danger to Mr. Scparta as well as the public health of the community at large.  Instead, to protect Mr. Scparta, his family, and the public, the Court will require Mr. Scparta to instead self-isolate for 14 days in his home.

It is FURTHER ORDERED that the parties shall meet and confer and submit a proposed order governing the conditions of Mr. Scparta's release, including his period of 14 days of self-isolation, no later than April 20, 2020 at 12 P.M.

SO ORDERED.

Dated: April  19 , 2020
        New York, New York

_____
        ALISON J. NATHAN
     United States District Judge